AEROSPATIALE HELICOPTER
CORP., Appellant,

v.

UNIVERSAL HEALTH SERVICES,
INC., Appellee.

No. 05–88–00730–CV.

Court of Appeals of Texas,
Dallas.

Aug. 25, 1989.

Rehearing Denied Oct. 4, 1989.

Michael V. Powell, Dallas, for appellant.

R. Brent Cooper, Dallas, J. Stephen Gibson, for appellee.

Before McCLUNG, BAKER and KINKEADE, JJ.

McCLUNG, Justice.

This case is a breach of contract action arising out of the crash of a Twinstar helicopter manufactured by appellant (Aerospatiale) and leased to appellee, Universal Health Services of Nevada (Universal) for use as an air ambulance. The tragic event, which killed all aboard, took place in Nevada.

Aerospatiale maintained in the trial court, and continues to maintain here, that the crash was caused by pilot error and that they are entitled to contractual indemnity from Universal under the express terms of the lease for amounts Aerospatiale expended to defend and settle the wrongful death suits brought against them by the families of the pilot and medical flight crew members.

Aerospatiale further alleges that Universal breached that portion of the lease requiring insurance coverage for damage to the helicopter because the policy actually acquired provided for a $25,000 deductible, thereby reducing the net proceeds received. Based on these allegations, Aerospatiale sought to recover the amount of the defense and settlement expenditures in the wrongful death suits, the deductible amount under the helicopter insurance policy, its attorney's fees in this suit, and contractual interest. In a trial to the court, the court determined, for a variety of reasons, that Aerospatiale was not entitled to recover under either the indemnity or insurance provisions of the lease and rendered judgment that Aerospatiale take nothing. From this judgment Aerospatiale appeals.

### Summary of Facts

The fatal flight was a medical evacuation from Las Vegas, Nevada, to Needles, California, and return. The helicopter began the flight by departing a helipad at Valley Hospital in Las Vegas at approximately 12:19 p.m., December 7, 1983. Paul Kinsey, an employee of Universal, was piloting the helicopter. Two other Universal employees, a nurse and a paramedic were also aboard the helicopter.

A few seconds after take off, an eyewitness observed that the helicopter's No. 1 engine cowling was open and stationary in a horizontal position. The cowling is the cover for one of the helicopter's two engines and when opened, the cowling is held out horizontally by a metal stay rod that has a ball-shaped end that fits into a socket on the aircraft. This cowling separated from the aircraft and was later located at a place on the ground indicating that separation took place after approximately four minutes of flight.

As the cowling departed the aircraft, the stay rod snagged a coiled steel cable connected to the governor that controlled the fuel input to the helicopter's No. 1 engine. That resulted in reducing this engine to idle speed and essentially took that one engine off-line as a power source for the helicopter.

As the model name "Twinstar" implies, the helicopter is equipped with twin engines, and is designed to, and does, fly on one engine. As a safety feature the aircraft is designed so that if one engine goes off line for any reason, the other engine automatically picks up the load. As it was designed to do, this helicopter automatically shifted all power requirements to the No. 2 engine; and the helicopter flew on and continued to fly for six more minutes, for a distance of approximately ten more miles.

At some point later, the pilot apparently looked at the instruments and saw that the No. 2 engine was running at higher than normal temperature and that the torquemeter for this engine was recording higher than normal. The trial court found that the pilot failed to follow the procedure prescribed by the aircraft's Flight Manual, to diagnose his situation.

The pilot, apparently erroneously concluding that the No. 2 engine was defective, shut off the fuel to the No. 2 engine. That action killed this engine, which at the time was the only operating engine and was supplying all of the aircraft's power. When the power was removed, the helicopter descended into the mountainous terrain. The pilot was unable to negotiate a safe landing; all aboard perished in the crash and resulting fire.

Aerospatiale brings forward thirty-three points of error on appeal. We group these points of error into subject areas and address them in that fashion.

### Proximate Causation

■ Aerospatiale contests the court's finding that the separation of the cowling from the helicopter caused the accident. Aerospatiale asserts that the cowling separation was, "as a matter of law" not a proximate cause or a producing cause of the crash. We note that Aerospatiale misnames its sufficiency argument on this point of error in that it characterizes this point as a "matter of law" point. Aerospatiale did not have the burden at trial to prove the cowling separation caused the accident. This contention was brought forward in Universal's answer and was properly characterized there as an affirmative defense. When the complaining party's opponent had the burden on the issue, the point raising legal insufficiency is properly styled "no evidence." It is only when the complaining party had the burden on the issue and it was answered adversely that the point is styled as a "matter of law" point. Cornelius, *Appellate Review of Sufficiency of the Evidence Challenges in Civil and Criminal Cases*, 46 Tex.B.J. 439, 440 (1983).

■ In reviewing legal sufficiency claims we must consider only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the trial court's finding. This Court must disregard all evidence and inferences contrary to the fact finding. If there is more than a *scintilla* of evidence to support the finding, the challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987).

As found by the trial court, when the engine cowling separated from the aircraft, the stay rod, which is normally used to hold the cowling open, snagged a coiled steel anticipator cable connected to the governor that controls the fuel input to the helicopter's No. 1 engine. The resulting damage reduced the No. 1 engine to idle speed and took that engine off-line as a power source for the aircraft. The aircraft, as it was designed to, automatically shifted the power requirements to the other engine. There is no evidence to indicate that the pilot was aware that this had occurred, although it would have been reflected in the instruments. The Valley Hospital pilot continued to fly the helicopter for approximately six minutes covering a distance of approximately ten miles after the cowling separated without incident. During this six minute period the aircraft flew over numerous places where the helicopter could have safely landed, but no effort or attempt to land was undertaken. The trial court further found that the pilot did not follow the emergency procedures prescribed for such event in the flight manual of this aircraft.

We agree with Aerospatiale that there is no evidence to show that the separation of the cowling from the aircraft was a proximate cause of the accident in question. At best the cowling separation was merely a prior cause. A prior cause cannot be made the basis for an action for damages if it does nothing more than furnish a condition or give rise to the occasion which makes the injury possible, if such injury is the result of some other cause which reasonable minds would not have anticipated, even though the injury would not have occurred but for such condition. *Wolf v. Friedman Steel Sales, Inc.*, 717 S.W.2d 669, 674 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.).

In *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370 (9th Cir.1977) the United States Court of Appeals for the Ninth Circuit denied recovery to a plaintiff in circumstances similar to these. In that case the pilot of a twin engine Cessna aircraft was killed when he attempted take-off with only one engine operational. The pilot in that case also failed to follow owners manual procedures which would have alerted him to the rear engine failure and the accompanying danger. The *Kay* court held that the pilot's failure to follow safe operating procedures was not foreseeable by the manufacturer. *Kay v. Cessna Aircraft Co.*, 548 F.2d at 1373. Texas law also focuses on the foreseeability of the intervening party's actions:

> In applying the test of foreseeability to situations where a negligently created pre-existing condition combines with a later act of negligence causing an injury there is a distinction between a situation in which one has created a dangerous condition and a later actor observes, or by the circumstances should have observed, the existence of the dangerous condition and a situation in which the dangerous condition is not apparent and cannot be observed by the actor. In regard to the first situation, the intervening act interrupts the natural sequence of the events and cuts off the legal effect of the negligence of the initial actor. This is based upon the premise that it is not reasonable to foresee or expect that one who actually becomes cognizant of a dangerous condition in ample time to avert the injury will fail to do so.

*Wolf v. Friedman Steel Sales, Inc.*, 717 S.W.2d at 673. It is not contested that the helicopter flew an additional six minutes and ten miles after the engine cowling separated from the craft. All the evidence at trial showed that one engine going off line was not, in itself, an emergency situation. This helicopter was designed to continue to fly on only one engine and it did so. All testimony reflects that if the pilot had followed the proper procedures this accident would not have happened.

The testimony shows that when the pilot apparently noticed that one of his engines was not functioning properly, he responded in a singularly reckless fashion. The pilot's first mistake was to ignore procedures outlined in the operator's manual to isolate a defective engine. Secondly, in shutting off the fuel supply to the operating engine, the pilot had to break a safety wire placed on the switch to assure that the fuel would not be shut off accidentally. The fact that a safety wire was present that had to be broken in order to shut off the fuel supply to an engine shows that shutting off the fuel was clearly contemplated as an extraordinary measure, not to be undertaken lightly. The pilot not only ignored the instructions in the manual, he also by-passed this additional safety feature in order to deliberately shut off the fuel. The pilot's actions in this regard were not foreseeable by Aerospatiale. Aerospatiale's sixth point of error dealing with proximate cause is sustained.

Aerospatiale, in points of error fifteen through seventeen, alleges that the evidence is factually as well as legally insufficient to support findings that the torquemeter for the No. 1 engine was inoperative and that its inoperation was a proximate cause of the crash. In a trial to the court a trial court's findings of fact are reviewable for factual and legal sufficiency by the same standards as are applied in reviewing the factual and legal sufficiency of evidence supporting a jury's answers to jury questions. *1st Coppell Bank v.*

*Smith,* 742 S.W.2d 454, 459 (Tex.App.—Dallas 1987, no writ); *Baker v. Baker,* 719 S.W.2d 672, 674–75 (Tex.App.—Fort Worth 1986, no writ); *Okon v. Levy,* 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.).

In reviewing the legal sufficiency claim we must consider only the evidence and reasonable inferences drawn therefrom, which, when viewed in their most favorable light, support the trial court's finding. The Court must disregard all evidence and inferences to the contrary of the fact finding. If there is more than a *scintilla* of evidence to support the finding, the challenge fails. *Stafford v. Stafford,* 726 S.W.2d at 16 (Tex.1987).

 Appellant also raises an "against the great weight and preponderance of the evidence" factual sufficiency argument with regard to the trial court's finding that the torquemeter was defective and a proximate cause of the accident. In reviewing all factual sufficiency points, the Court will consider all of the evidence in the record that is relevant to the fact being challenged. This Court may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Our scope is therefore broader than it was in considering appellant's legal sufficiency argument. Here we consider all of the evidence, not just evidence and logical inferences from that evidence which support the finding of the trier of fact. However, this Court is not a fact finder. We do not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact. This is true even if there is conflicting evidence upon which a different conclusion could be supported. *Clancy v. Zale,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

Our reasoning on this point is the same as for the proximate cause finding with regard to the engine cowling. Even if we assume, without deciding, that there is sufficient evidence to uphold, both factually as well as legally, the trial court's finding that the torquemeter was, indeed inoperative, it was not a proximate cause of the accident.

In deciding this point, we note that there is some testimony that the torquemeter could have been a contributing cause to the accident. Accordingly, we cannot sustain Aerospatiale's legal sufficiency claim on this point. However, when weighed against all the evidence to the contrary, we hold that the finding of proximate cause was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

There was a good deal of evidence relevant to this point presented at trial: (1) There is testimony from James Thomas Moran, an air safety investigator, that the number one torquemeter was inoperational, and that, in his opinion, the defective torquemeter was another cause of the accident; however, Moran also testified that the pilot did not follow proper procedures once he determined that something was wrong with the aircraft. (2) There was a good deal of conflicting evidence on whether or not the torquemeter was operational at the time of the fatal flight, whether or not it was working at the time of the accident is speculation. (3) It is the pilot's responsibility to be sure that the aircraft is in proper flight condition. (4) If the pilot had determined that the torquemeter was not operational at the time of the flight, there was another fully operational aircraft ready for him to utilize instead of this one. (5) If the pilot made the required preflight check of his instruments he discovered that the torquemeter was not operational, if in fact it was not, and was therefore not misled by its improper readings. (6) The fact that one engine was not operating was not, in itself, an emergency situation. (7) There were plenty of places that the pilot could have landed the aircraft. (8) If the pilot had followed proper manual emergency procedures, it is uncontested that he would have discovered the source of the problem. (9) The pilot, in shutting off the fuel to the number two engine, not only ignored the proper procedures, but he also bypassed several safety features of the aircraft designed to prevent the fuel from

being shut off except in extreme circumstances.

■■■■ Where a finding of proximate causation could only be reached by indulging in speculation and the stacking of one inference upon another, such finding is against the great weight and preponderance of the evidence. *U.S. Steel Corp. v. Fiberex, Inc.,* 751 S.W.2d 628, 637 (Tex. App.—Dallas 1988, writ granted); *See Also Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex. 1988) (Directed verdict proper in medical malpractice case where plaintiff did not establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury). We hold that even if the torquemeter was inoperational at the time of the crash, and, even if we assume, without so holding, that it was Aerospatiale's duty to keep the craft in good repair, the finding that this defect caused the accident is against the great weight and preponderance of the evidence.

### The Indemnity Agreement

Appellee urges that if we find that the accident in question is not covered under the indemnity agreement for one of several reasons we must affirm the judgment of the trial court. We therefore must address the applicability of the agreement to the crash of the aircraft. Before addressing the indemnity agreement itself, we must settle the question of whether this contract is to be interpreted under the laws of Texas or of Nevada. We hold that the enforceability of this contract is to be determined under the laws of the State of Texas.

Paragraph IX of the lease between the parties states that the lease agreement shall be construed and interpreted in accordance with the laws of Texas. The trial court overrode the parties' contractual choice of Texas law and applied Nevada law to the indemnity clause. The court then concluded that the indemnity agreement violated a fundamental public policy of Nevada. This choice of law decision was error.

■■■■ The general rule is that the law of the State where the contract is made controls with respect to validity, interpretation and obligations under the contract. If the place of performance is different from that of the making of the contract, the place of performance may control. Overriding these general principles, however, is the rule that an express agreement of the parties that the contract is to be governed by the laws of a particular State will be given effect if the contract bears a "reasonable relation" to the chosen State and no countervailing public policy of the forum [in this case Texas] demands otherwise. *First Commerce Realty Investors v. K-F Land Co.,* 617 S.W.2d 806, 808-09 (Tex.Civ.App. —Houston [14th Dist.] 1981); TEX.BUS. & COM.CODE ANN. § 1.105(a) (Vernon Supp.1989).

■■■■ We conclude that this lease had a reasonable relationship to the State of Texas. Aerospatiale's facilities and headquarters are located in Grand Prairie, Texas. Rental payments were made to these offices. The lease required the return of the helicopter to Grand Prairie at the end of the lease term. There were numerous other incidental terms of the lease that further tied the arrangement to Texas. For these reasons, we hold that the transaction bore reasonable relation to the State of Texas and that the parties' choice of law satisfies the "reasonable relation" requirement of the Texas Business & Commerce Code. *See Mostek Corp. v. Chemetron Corp.,* 642 S.W.2d 20, 24 (Tex.App.—Dallas 1982 writ dis'm. w.o.j.).

■■■■ The trial court made a conclusion of law that application of Texas law to the indemnity provisions of the lease would be contrary to a fundamental policy of Nevada. This conclusion of law misconstrues the laws of Texas. The choice of law of the parties is to be given effect if the contract bears a reasonable relation to Texas and no countervailing public policy *of the forum* demands otherwise. *First Commerce Realty Investors v. K-F Land Co.,* 617 S.W.2d at 809. It is the public policy of Texas as the forum state, not of Nevada, that impacts upon whether the parties' choice of law will be upheld. We

hold that the indemnity agreement in the instant case is to be construed under Texas law, not the law of Nevada and accordingly we sustain Aerospatiale's point of error number 20.

The trial court, after coming to the conclusion that the agreement violated a fundamental policy of Nevada, invalidated the lease's indemnity clause. Since we have determined that the indemnity agreement is to be construed under Texas law we would, in the usual case, simply remand to the trial court for reconsideration of the lease under Texas law. In this case, however, the trial court went further and held, in the alternative, that the lease's indemnity clause would also fail under Texas law for several reasons. Since it is before us, we hold that the lease agreement in the instant case is valid under Texas law and accordingly sustain Aerospatiale's points of error Nos. 22 through 24.

■■■ Before we reach the validity of the contractual indemnification agreement, we must consider the effects of Aerospatiale's decision to settle the previous Nevada actions. In the previous lawsuit, since Aerospatiale chose to settle rather than risk a trial, there were no findings of liability on their part. Where an indemnitee, absent an unconditional contractual right to settle, settles a claim against it without obtaining a judicial determination of its liability, it assumes the burden in its action for reimbursement of proving facts which might have rendered it liable to the claimant, as well as the reasonableness of the amount which it paid. It is necessary for Aerospatiale to establish that from its standpoint the settlement was made in good faith and was reasonable and prudent under the circumstances. *Pan American Gas Co. v. Natural Gas Const. Corp.*, 418 S.W.2d 380, 381 (Tex.Civ.App.—Waco, 1967 writ ref'd n.r.e.). In this case the trial court expressly found that Aerospatiale's settlement of the three Nevada actions was reasonable in light of Aerospatiale's potential liability to the plaintiffs in that case. This finding is not contested by Universal.

■■■ Universal urges in its fourth reply point that regardless of the enforceability of the indemnity agreement, the judgment of the trial court must be affirmed because when an indemnitee (Aerospatiale) pays a third party's money claim against an indemnitor (Universal) to which claim the indemnitor (Universal) had a good defense, the indemnitee (Aerospatiale) is not entitled to recover against the indemnitor (Universal). *Producing Properties, Inc. v. Sohio Petroleum Co.*, 428 S.W.2d 365, 367 (Tex. Civ.App.—Dallas, 1968, no writ). The rule in that case is not applicable here because, quite simply, Aerospatiale settled with a third party whose claim was against Aerospatiale personally. Aerospatiale did not settle a claim held by a third party against Universal. Aerospatiale was sued individually; their choice to settle does not bar them from seeking indemnification from Universal should the contract so allow.

■■■ In its conclusion of law No. 11 the trial court concluded that the indemnity agreement in the lease did not clearly and unequivocally provide indemnity to Aerospatiale for Aerospatiale's own negligence, strict liability, and/or gross negligence. The so-called "clear and unequivocal" test is no longer the law in Texas. These contractual indemnity agreements are to be construed under the "express negligence" doctrine which provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms.

■■■ Under the doctrine of express negligence, the intent of the parties must be specifically stated within the four corners of the contract. *Ethyl Corporation v. Daniel Construction Co.*, 725 S.W.2d 705, 708 (Tex.1987). The indemnity agreement in this case provides as follows:

V. INDEMNITY: The LESSEE will indemnify and hold harmless the LESSOR, its agents, servants, and assigns from and against any and all losses, damages, injuries, claims, demands and expenses including legal expenses of whatsoever kind and nature arising on account of (i) the use or operation of the helicopter or any part thereof, by whomsoever used or operated other than the LESSOR, its

agents, servants, or employees and (ii) the installation or removal of any unit of equipment pursuant to any provisions of this lease; provided, however, that in no event shall LESSEE be liable for any loss, damage, injury or claim resulting from any latent defect which is not discovered or discoverable by LESSEE's inspection prior to taking of possession by LESSEE. LESSEE shall not be liable for loss, damage, injury or claim which is the proximate result of the sole negligence of the LESSOR or LESSOR's agents, servants, or assigns.

We note first that this indemnity clause, by its own terms, provides no right to indemnity should there be a finding of a latent defect which not discovered or discoverable by Universal or if there is a finding of sole negligence on the part of Aerospatiale. Also, the contract in question contains no provision for contractual comparative indemnity. Indemnitees seeking indemnity for the consequences of their own negligence which proximately causes injury jointly and concurrently with the indemnitor's negligence must also meet the express negligence test. *Ethyl Corp.,* 725 S.W.2d at 708. Consequently, in order to be entitled to indemnity, Aerospatiale must be found to be completely blameless with regard to the accident. See *Ethyl,* 725 S.W.2d 708 (Holding that in Texas there exists no right to indemnity on a comparative basis under the common law).

 In its point of error No. 24 Aerospatiale asserts that the trial court erred in holding that Aerospatiale's indemnity claim would be barred under the Texas Workers' Compensation Act. We agree. The Texas Workers' Compensation Act provision relied upon by the trial court in making this holding applies only to subscribers to the act. TEX.REV.CIV.STAT. ANN. art. 8306, 3(a) (Vernon Supp.1989). As Aerospatiale points out, there is no evidence whatsoever that Universal, a Nevada corporation, was a subscriber to the Texas Workers' Compensation Act. We sustain Aerospatiale's point of error No. 24.

We must now consider whether this accident is covered under the terms of the indemnity agreement. In points of error No. 25 through No. 27 Aerospatiale contends that the trial court erred in entering conclusions of law which state that the claims asserted in the Nevada lawsuits do not fall within the scope of the indemnity agreement. We agree.

The arguments brought forward by appellee on this point are twofold. First, Universal alleges that this incident is not covered under the indemnity agreement because the accident did not arise on account of Universal's use or operation of the helicopter. We agree with Aerospatiale that these conclusions are apparently based on the trial court's erroneous findings and conclusions that the accident was proximately caused by Aerospatiale's defective design or negligence. Because we have sustained these insufficiency points, this argument must also fail.

Universal also presents another argument, urged for the first time on appeal, that the accident in question is not covered because of certain wording in the indemnity agreement itself. The agreement in this case provides for indemnification for basically all expenses and losses arising on account of:

(i) the use or operation of the helicopter or any part thereof, by whomsoever used or operated other than the LESSOR, its agents, servants, or employees *and* (ii) the installation or removal of any unit of equipment pursuant to any provisions of this lease....

Universal places special emphasis on the fact that these two subsections are joined by the word "and." Thus, they argue, to establish that the underlying claims fell within the scope of the indemnity clause, Aerospatiale was required to prove that the claims satisfied *both* subsections. Therefore, since there is no evidence in the record that the underlying claim made against Aerospatiale was based in any way on the installation or removal of any unit of equipment pursuant to a provision of the lease, Aerospatiale's claim for indemnity falls outside the scope of the indemnity provision. We disagree.

This Court is mindful of the fact that indemnity agreements are to be strictly construed in favor of the indemnitor. However, the doctrine of *strictissimi juris* is not a rule of construction. Rather, it is a rule of substantive law applicable only after the parties' intent has been ascertained through ordinary rules of construction. *Keystone Equity Management v. Thoen*, 730 S.W.2d 339, 340 (Tex.App.—Dallas 1987, no writ). In determining intent, the general rule is that words and phrases will be given their ordinary, popular, and commonly accepted meaning. *Id.*

Although in common usage "and" is conjunctive and "or" is disjunctive, and, therefore, the two are not usually interchangeable, they are interpreted as synonymous when the context so requires in order to give effect to the manifest intent. *Neighborhood Committee on Lead Pollution, et al. v. Board of Adjustment of the City of Dallas*, 728 S.W.2d 64, 68 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). One of the recognized uses of "and" is to refer to "either or both" of two alternatives, when "or" might be interpreted as referring to only one or the other. *Id.* A common sense reading of the indemnity agreement is that Universal agreed to indemnify Aerospatiale for liability arising from two separate circumstances which the lease placed under Universal's exclusive control: use and operation of the helicopter, and alteration of the helicopter. We hold that the accident in question is covered within the scope of the indemnity agreement contained in this lease.

### Insurance Provisions of the Lease in Question

In its points of error No. 28 through No. 30 Aerospatiale alleges that the trial court erred in refusing to award Aerospatiale damages for Universal's refusal to pay the $25,000 deductible under the insurance policy secured pursuant to the lease. Because these three points of error address essentially the same issue, we address them concurrently.

The lease between Aerospatiale as lessor and Universal would provide Aerospatiale with $878,000 in insurance against total loss of the helicopter. On or about November 30, 1983, Aerospatiale received a Telex from Universal's insurance broker confirming that "all risk" hull insurance had been obtained for the amount of $878,000, with a $25,000 "in motion" deductible. The crash occurred one week later. When the proceeds were received, Universal paid Aerospatiale $853,000, which was the amount of insurance required by the lease minus the $25,000 deductible. Aerospatiale demanded that Universal pay the $25,000 deductible, but Universal refused to do so.

Aerospatiale pleaded in the court below for recovery of the $25,000 plus interest at the contract rate of 10 percent. The trial judge entered conclusions of law stating that Universal had satisfied the provisions of the lease regarding hull insurance and that Aerospatiale has waived, and is estopped, from claiming the additional $25,000. We disagree.

Unable to locate any Texas cases on this point, we find *Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp.*, 707 F.2d 1086 (9th Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) to be persuasive. In *Dillingham*, defendant was obligated to obtain full insurance on its barge for the benefit of Dillingham as insured, with loss payable to defendant. The barge was valued at $1.9 million. Defendant secured the policy, but left a $1,000,000 deductible. In the suit following loss of the barge during towing, Dillingham sought to hold defendant liable for the full amount of the policy. Defendant argued that Dillingham had waived any objection to the deductible because it was informed of the fact that the policy had this deductible provision prior to the commencement of the tow and did not object until after the sinking. This argument was rejected; Dillingham's knowledge of the deductible and failure to object simply did not amount to waiver. *Dillingham*, 707 F.2d at 1091.

The contract in this case clearly provides that Universal agreed to insure "the helicopter against total loss in an amount not less than EIGHT HUNDRED SEVENTY–

EIGHT THOUSAND DOLLARS—($878,-000)." The contract provides further that Universal obtain all risk hull insurance in the same amount. No particular insurance carrier is specified, specific insurance coverage provisions, such as deductibles, are not mentioned. The contract merely specifies the amount of coverage of the policy.

The only witness to give any testimony whatsoever about the insurance deductible was Aerospatiale's former employee McPhilimy. It was his testimony that he saw the Telex from Universal's broker and that the deductible meant to Aerospatiale that Universal was self-insuring for the deductible amount. McPhilimy explained that helicopter leases commonly purchase insurance with deductibles to lower their premiums. He explained that the only time that Aerospatiale would object to a deductible was when they did not consider a lessee creditworthy for the deductible amount.

■ Universal points to paragraph XIV of the lease, which provides in part:

XIV. DEFAULT: In the event LESSOR deems any undertaking of LESSEE herein to be in default, LESSOR shall notify LESSEE within five (5) days from the receipt of such notice. If not corrected to the satisfaction of LESSOR within such time, LESSOR may declare the lease terminated and may take possession of the leased property from any person whomsoever in whose custody it may be found.

Universal contends that this provision of the lease, setting forth Aerospatiale's agreement to notify Universal of events of default, imposed upon Aerospatiale a duty to tell Universal that the $25,000 deductible was not satisfactory to Aerospatiale. Considering all of the evidence in the record that is relevant to the fact being challenged, we hold that there is insufficient evidence for the trial court to have found that Universal satisfied the provisions of the lease requiring insurance coverage in the amount of $878,000 and that Aerospatiale has waived the contractual requirement of the full $878,000 in total loss coverage. We sustain points of error No. 28

through No. 30 and reverse and remand to the trial court.

Aerospatiale further contests that the trial court erred in refusing to award Aerospatiale damages in the form of agreed contractual interest for Universal's failure to make timely payment for total loss of the helicopter. Since we are reversing and remanding for reconsideration of whether Aerospatiale is entitled to the full $878,000 full value of the helicopter or is estopped from claiming entitlement to the $25,000 deductible, the calculation of the precise amount of interest due is not calculable at this time.

By way of summary, we hold the following: (1) that the engine cowling separation was not a proximate cause of the accident as a matter of law; (2) that there is insufficient evidence to support the trial court's finding that the torquemeter was inoperative and caused the accident in question, and we accordingly reverse and remand on these points; (3) that the indemnity agreement in this case is to be construed under Texas law, that this agreement is valid under Texas law; and, that the accident in question falls within the scope of the agreement; and (4) we further reverse and remand this cause on the issue of whether Aerospatiale is estopped from pursuing the entire $878,000 amount provided for in the contract.

BAKER, J., dissenting.

BAKER, Justice, dissenting.

I respectfully dissent.

I would affirm the trial court's judgment regarding indemnity because Aerospatiale's claim for indemnity was not within the scope of the indemnity clause of the lease agreement. The indemnity clause provided:

V. INDEMNITY: The LESSEE will indemnify and hold harmless the LESSOR, its agents, servants, and assigns from and against any and all losses, damages, injuries, claims, demands and expenses including legal expenses of whatsoever kind and nature arising on account of (i) the use or operation of the

helicopter or any part thereof, by whomsoever used or operated other than the LESSOR, its agents, servants, or employees *and* (ii) the installation or removal of any unit of equipment pursuant to any provisions of this lease; provided, however, that in no event shall LESSEE be liable for any loss, damage, injury or claim resulting from any latent defect which is not discovered or discoverable by LESSEE's inspection prior to taking of possession by LESSEE. LESSEE shall not be liable for loss, damage, injury or claim which is the proximate result of the sole negligence of the LESSOR or LESSOR's agents, servants, or assigns.

(Emphasis added.)

General rules relating to interpretation and construction of contracts are applicable to indemnity contracts. *Sun Oil Co. v. Renshaw Well Service, Inc.*, 571 S.W.2d 64, 68 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.); *see Ideal Lease Service, Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 952–53 (Tex.1983). Under those general rules, the question of whether a contract is ambiguous is a question of law for the court. In interpreting a contract, the primary concern of the court is to ascertain and give effect to the intentions of the parties as expressed in the instrument. To achieve this object, the court will examine and consider the entire contract, seeking to harmonize and give effect to all of its provisions so that none will be rendered meaningless.

In determining whether a contract is ambiguous, the court applies established rules of interpretation. *See R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518–19 (Tex.1980); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). Rules of construction (as opposed to rules of interpretation) are not applied unless the contract is determined to be uncertain or ambiguous. *See General Am. Indem. Co. v. Pepper*, 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *Universal C.I.T.*, 243 S.W.2d at 157. However, after the intent of the parties has been determined, the cardinal rule that the indemnitor is entitled to have its undertaking strictly construed in its favor may then

be applied, thereby preventing liability under the indemnity contract from being extended beyond the terms of the agreement. *See Ohio Oil Co. v. Smith*, 365 S.W.2d 621, 627 (Tex.1963), *overruled on other grounds, Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex.1987); *Hudson v. Hinton*, 435 S.W.2d 211, 214 (Tex. Civ.App.—Dallas 1968, no writ); *Sun Oil*, 571 S.W.2d at 68.

If a contract is so worded that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. On the other hand, a contact is ambiguous when application of proper rules of interpretation leave the court genuinely uncertain about the contract's proper meaning. *See R & P Enterprises*, 596 S.W.2d at 519; *Universal C.I.T.*, 243 S.W.2d at 157. The language used by the parties in a contract should be accorded its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985); *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex.1966).

The strict meaning of the words "and" and "or" are more readily departed from than the meanings of other words, and one may be read in place of the other in deference to the meaning of the context. *Young v. Rudd*, 226 S.W.2d 469, 474 (Tex. Civ.App.—Texarkana 1950, writ ref'd n.r. e.). However, the word "and" will not be construed to mean "or" except for strong reasons, and the words should never be so construed unless the context favors the conversion. Examples of such exceptional circumstances are when the substitution is necessary to effectuate the manifest intention of the user, or when the failure to substitute renders the meaning ambiguous or the result absurd, or when the failure to substitute amounts to a refusal to correct a mistake. *See Board of Ins. Comm'rs v. Guardian Life Ins. Co.*, 142 Tex. 630, 180 S.W.2d 906, 908 (1944). The words "and" and "or" are not generally treated as interchangeable unless their accurate reading renders the sense of the instrument dubious. *See Young v. Rudd*, 226 S.W.2d at

474. Ordinarily, the words "and" and "or" are in no sense interchangeable terms but are used in the structure of language for purposes entirely different, "and" being strictly of a conjunctive nature, whereas "or" is of a disjunctive nature. *Board of Ins. Comm'rs,* 180 S.W.2d at 908; *American Nat'l Ins. Co. v. Wilson State Bank,* 480 S.W.2d 296, 300 (Tex.Civ.App.—Amarillo 1972, no writ).

Applying established rules of interpretation to determine the parties' intent as expressed in the indemnity clause, the word "and" should be accorded its plain grammatical meaning. In other words, "and" means "and"; it does not mean "or." Neither Aerospatiale nor the majority provide support for their conclusory determination that "and" should be read to mean "or." On the contrary, there are no strong reasons for departing from the general rule that "and" and "or" are not interchangeable. Reading "and" to mean "or" is not required by context or by the manifest intent of the parties. Moreover, reading "and" as "and" does not render the meaning ambiguous or the result absurd, nor does it constitute a refusal to correct a mistake. In short, there is nothing inherently unreasonable in attaching to the word "and" its normal conjunctive meaning. Had the parties intended a disjunctive meaning, they could have easily used the word "or" instead of "and." *See American Nat'l Ins.,* 480 S.W.2d at 300.

When the word "and" is given its ordinary and reasonable meaning, the indemnity clause is unambiguous. Under the plain terms of the clause, Universal is required to indemnify Aerospatiale *only* in cases involving *both* use or operation of the helicopter by anyone other than Aerospatiale *and* the installation or removal of any unit of equipment pursuant to provisions of the lease. The record contains no evidence of installation or removal of any unit of equipment. Therefore, Aerospatiale's claim for indemnity fails because it is not within the scope of the indemnity clause. Having determined the parties' intent from the unambiguous terms expressed in their contract, the conclusion reached is then strengthened by the rule that the indemnitor (Uni-

versal) is entitled to have its undertaking strictly construed in its favor, thereby preventing liability from being extended beyond the terms of the agreement. *See Ohio Oil,* 365 S.W.2d at 627; *Hudson v. Hinton,* 435 S.W.2d at 214; *Sun Oil,* 571 S.W.2d at 68.

When an indemnity contract is unambiguous, the rights and liabilities of the parties must be determined by giving legal effect to the contract as written. Intent is determined from the contract itself, and the scope of coverage stated in an indemnity contract cannot be expanded based solely upon what a court may perceive to be the improperly expressed intentions of the parties. *Ideal Lease Service,* 662 S.W.2d at 953. The result-driven conclusion reached by the majority is lacking in proper legal foundation. I would affirm the trial court's take nothing judgment on the claim for indemnity. This determination effectively disposes of all of Aerospatiale's points of error concerning the cause of the crash and enforcement of the indemnity clause. I would overrule points one through twenty-seven.

I would also affirm the trial court's judgment regarding the provision of insurance. The relevant provisions in the lease stated:

IV. INSURANCE:

A. LESSEE agrees to furnish LESSOR certificates of insurance evidencing that LESSEE has at LESSEE's expense:

. . . .

4. insured the helicopter against total loss in an amount not less than EIGHT HUNDRED SEVENTY EIGHT THOUSAND DOLLARS—($878,-000.00) U.S. Dollars.

5. obtained all risk hull insurance in the amount of not less than EIGHT HUNDRED SEVENTY EIGHT THOUSAND DOLLARS—($878,-000.00) U.S. Dollars, specifying LESSOR as loss payee as its interest may appear and LESSEE as co-insured.

B. In the event of total loss, LESSEE shall immediately pay to LESSOR such monies due, together with interest at the rate of ten percent (10%) per annum on

all such monies not received by LESSOR within sixty (60) days of such total loss. The lease also contained a provision on default that stated in pertinent part:

XIV. DEFAULT: In the event LESSOR deems any undertaking of LESSEE herein to be in default, LESSOR *shall* notify LESSEE in writing of such default and it shall be corrected by LESSEE within five (5) days from the receipt of such notice.

(Emphasis added.)

Universal notified Aerospatiale that it had obtained hull insurance for the helicopter in the amount of $878,000 with a $25,000 "in motion" deductible. If such insurance was regarded by Aerospatiale as not in compliance with the lease provisions, Aerospatiale was required by the default provisions of the lease to notify Universal of the default. There is no evidence that Aerospatiale did so. There was testimony by John McPhilimy, a former Aerospatiale employee, that the existence of the deductible meant to Aerospatiale that Universal was self-insuring for the deductible amount. This testimony regarding Aerospatiale's unilateral view of the situation is irrelevant. One party's self-interested and unilateral interpretation of a situation simply cannot be the basis for a claim of breach of contract. It is elementary that a contract is by definition a mutual agreement, and any breach of that agreement is determined by its express terms, not by one party's unilateral interpretation that was never communicated to the other party. *See Finley v. Hundley*, 252 S.W.2d 958, 962 (Tex.Civ.App.—Dallas 1952, no writ); *Sweeney v. Cross*, 476 S.W.2d 464, 465 (Tex.Civ.App.—El Paso 1972, no writ).

Estoppel may arise as effectually from silence as from words spoken when there is a duty to speak. *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex.1979); *see Echols v. Yeates Dev. Co.*, 565 S.W.2d 277, 280 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.). Estoppel by silence arises when a person is under a duty to another to speak but refrains from doing so and thereby leads the other to act in reliance upon a mistaken understanding of the facts. *Williams v. Stans-*

*bury*, 649 S.W.2d 293, 296 (Tex.1983); *Page Airways, Inc. v. Associated Radio Serv. Co.*, 545 S.W.2d 184, 193 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.). According to these principles, Aerospatiale is estopped from asserting that Universal breached the lease provisions on obtaining insurance. The lease clearly required Aerospatiale to notify Universal of any breach of those provisions. Despite this duty, Aerospatiale did not notify Universal that the policy deductible was unacceptable. Aerospatiale's unilateral assumption that Universal had chosen self-insurance in the amount of $25,000 is irrelevant and provides no basis for a claim of breach of contract. On the other hand, not having been informed otherwise, Universal was entitled to rely on its apparent compliance with the insurance provisions. This reliance was clearly justified and authorized by the express terms of paragraph XIV of the lease on default. I would overrule Aerospatiale's points of error twenty-eight through thirty.

The reliance by Aerospatiale and the majority upon *Dillingham Tug & Barge Corp. v. Collier Carbon & Chemical Corp.*, 707 F.2d 1086 (9th Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), is misplaced. The majority ignores a number of important distinctions between *Dillingham* and this case. In *Dillingham*, a towing contract required the defendant/owner to maintain insurance on a barge to its full value. The contract also provided that the defendant/owner would look *only* to the insurance for recovery for any loss or damage. The defendant obtained insurance with a $1,000,000 deductible, which effectively left the barge insured for about *half* of its value. *Dillingham*, 707 F.2d at 1088–89, 1091. All of these facts distinguish *Dillingham* from this case. Moreover, the *Dillingham* court acknowledged that "some deductible might have been reasonably anticipated under the contract." What the court specifically disapproved was the insuring of the barge for half of its value. *Dillingham*, 707 F.2d at 1091. In my view, *Dillingham* does not support the majority's conclusion.

In point of error thirty-one, Aerospatiale contends that the trial court erred in re-

fusing to award damages in the form of agreed contractual interest because of Universal's failure to make timely payment of the insurance proceeds. The pertinent lease provision is found in paragraph IV, quoted above. It provided that in the event of total loss, Universal shall pay to Aerospatiale such monies due along with interest of 10 percent per annum on all such monies not received by Aerospatiale within sixty days of the total loss. The helicopter crash occurred on December 7, 1983. Universal released an insurance check for $853,000 to Aerospatiale on August 16, 1984. Under the lease, Universal was clearly obligated to pay interest on the $853,000 from sixty days after the crash to the date of release of the check. I would sustain point of error thirty-one. Because I am unable to substantiate Aerospatiale's determination of the exact amount of interest due and owing, I would overrule point of error thirty-two.

In point number thirty-three, Aerospatiale argues that the trial court erred in failing to award attorneys' fees to Aerospatiale. Because point of error thirty-one should be sustained, I would also sustain point number thirty-three. In letters dated August 27, 1984, and February 7, 1985, Aerospatiale demanded to be afforded all rights to which it was entitled under the insurance provisions of the lease. Since Aerospatiale was entitled to judgment for contractual interest on the insurance proceeds, it was also entitled to an award of attorneys' fees. TEX.CIV.PRAC. & REM. CODE ANN. §§ 38.001(8), 38.002 (Vernon 1986); *see Findlay v. Cave*, 597 S.W.2d 37, 40–41 (Tex.Civ.App.—Fort Worth 1980), *aff'd*, 611 S.W.2d 57 (Tex.1981).

In summary, points of error one through thirty and thirty-two should be overruled. Points thirty-one and thirty-three should be sustained. This cause should be remanded for determination of the amount of contractual interest owed to Aerospatiale on the insurance proceeds and for an award of attorneys' fees to Aerospatiale.